UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v

WAYNE COUNTY AIRPORT AUTHORITY,

    Defendant.

CRIMINAL NO. 06-20300

OFFENSE:
Clean Water Act -- 33 U.S.C. §1319(c)(1)(A)

STATUTORY MAXIMUM FINE: $200,000

FILED
JUN - 8 2006
CLERK'S OFFICE
DETROIT

### RULE 11 PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the defendant Wayne County Airport Authority (the "Authority" or the "defendant"), the defendant's attorney, and the United States of America (collectively, the "parties") agree as follows:

1.     <u>Guilty Plea</u>.

A.     Defendant will plead guilty to a violation of the Clean Water Act, 33 U.S.C. §1319(c)(1)(A), as set forth in the attached Information.

B.     The elements of the offense that the government would need to prove beyond a reasonable doubt at trial are:

    (1)     On or about May 16-18, 2001, the Authority's predecessor, the Charter County of Wayne, Michigan (the "County"), the former operator of the Detroit Metropolitan Wayne County Airport (the "Airport"), violated a permit condition and limitation in an NPDES permit issued by the State of Michigan to the Airport and the predecessor Airport operator;

Defendant's Initials

(2) The Authority's predecessor Airport operator failed to report the discharge of turbid water to the Frank and Poet Drain when, in accordance with 33 U.S.C. §§ 1311 and 1342, the Airport's NPDES permit provided that the Airport was required to report "unusual" or "unnatural" characteristics of discharges (including turbidity and color) immediately or within 24 hours, and in writing within 5 days, and

(3) The Authority's predecessor Airport operator negligently failed to report as required.

2. <u>Factual Basis</u>

Unless otherwise noted, the parties stipulate to the following, which the United States is prepared to prove, as the factual basis for the Authority's plea:

The Airport is located in Wayne County, Michigan, some 12 to 15 miles southwest of the City of Detroit. Occupying some 6,700 acres with six runways and 139 gates, the Airport is the principal airport for the City of Detroit, its suburbs, and the State of Michigan.

Prior to August 9, 2002, the Airport was operated by the Charter County of Wayne, Michigan (the "County").

Pursuant to a 2002 amendment to the Aeronautics Code of the State of Michigan, operational jurisdiction of the Airport was transferred to the Authority on August 9, 2002.

In order to accommodate year-round precipitation and control the potential for downstream flooding, there are a number of large ponds that collect storm water runoff at the Airport. Ponds 3E, 4, and 6, which occupy dozens of acres, hold accumulated storm water runoff which is ultimately discharged to receiving streams near the Airport. Ponds 3E and 4,

Defendant's Initials

which are connected, have a maximum capacity of some 206,000,000 gallons. Pond 6, the largest at the Airport, holds some 216,000,000 gallons.

Because of the region's harsh winters, air carriers at the Airport use significant quantities of aircraft deicing fluids on planes that use the Airport's gates and runways. The Airport has a separate system for collecting run-off from areas where aircraft deicing takes place (at the gates, freight ramps, and deicing pads). This run-off, which contains low (non-recyclable) amounts of aircraft deicing fluid ("contaminated stormwater"), is directed to Pond 3W. Pond 3W has a capacity of some 74,000,000 gallons.

Ponds 4 and 6 have outfalls which, when open, discharge to the Frank and Poet Drain, a waterway that flows directly into the Detroit River, near Lake Erie. Pond 3W discharges to the sanitary sewer that conveys the contaminated stormwater to the Wyandotte Wastewater Treatment Plant ("WWTP") for treatment and ultimate discharge to the Detroit River. Pond 3W is immediately adjacent to Pond 3E, and has a gate which, when open, connects it to Pond 3E. This gate, however, is kept closed during deicing season and is typically opened only in the summer months long after deicing has ceased at the Airport.

During the relevant time period, the Airport was operated pursuant to two permits issued under the authority of the Clean Water Act. NPDES Permit No. MI0036846 (the "Permit"), issued to the Airport and the County on February 11, 1998, allowed the discharge of storm water into the Frank and Poet and Sexton-Kilfoil Drains from several outfalls. One of these outfalls, identified as Outfall 4 on the Permit, discharged from Ponds 4 and 3E to the Frank and Poet Drain.

Defendant's Initials

A second permit, known as an Industrial User's permit, allowed the discharge of contaminated stormwater, from Pond 3W into sewers which lead to WWTP.

The Permit provided that during the period from October 1 through April 30, the discharge of storm water was permitted, subject to, among other things, numeric limits on concentrations of carbonaceous biochemical oxygen demand (CBOD5), ammonia nitrogen (N), oil and grease, dissolved oxygen (DO), and pH. The Permit conditions for the summer season, May 1 through September 30, were different than the conditions applicable during deicing season. For the summer season, the Permit set forth numeric concentration limits only for oil and grease and only the reporting of other parameters was required for the Airport's summer season discharges. The Permit also expressly prohibited the discharge of deicing materials to receiving waters during this season.

Other requirements in the Permit were applicable year-round. Among other things, the Permit expressly provided, with respect to discharges from the outfalls at the Airport, that: "[a]ny unusual characteristics of the discharge (i.e., unnatural turbidity, color, . . .) shall be reported within 24 hours to the Southeast Michigan District Supervisor of the Surface Water Quality Division followed with a written report within five (5) days detailing the findings of the investigation and the steps taken to correct the condition." Permit, Part I.A.2.c. Elsewhere in the Permit, at Part I.A.8.i.2., which relates to Water Quality Standards, it provides that "unusual characteristics of the discharge," including, among other things, "unnatural turbidity [and] color," "shall be reported immediately to the Southeast Michigan District Supervisor of the Surface Water Quality Division."

Defendant's Initials

Sometime during the second week in April, 2001, a collapsed plastic milk crate clogged the valve that allowed Airport personnel to discharge contaminated stormwater from Pond 3W to the sanitary sewer leading to the WWTP. By April 12, discharges from Pond 3W to the sewer had diminished to 10,000 gallons a day, compared to the 2 million gallon per day average during this time period. The cause of the plugging was not known at the time.

As noted above, Pond 3W collects contaminated stormwater. Aircraft deicing materials, mostly ethylene glycol and propylene glycol, from the gates, freight ramps, and deicing pads that were not collected for recycling, would mix with precipitation and snow melt during deicing events. This contaminated stormwater was collected as part of the Pond 3W stormwater collection system. During April and May, aircraft deicing materials in the contaminated stormwater naturally biodegraded. The breakdown of the deicing materials, changes in temperature, and sediment uptake would depress oxygen levels in the ponds. When this happened, the pond water would turn dark and become odorous.

After several attempts to jet rod the pipe failed, Airport employees decided that Pond 3W would need to be largely emptied in order to repair the valve. Accordingly, pumps and hoses were brought in to pump water from Pond 3W to a nearby manhole that led into the sanitary sewer. These attempts were labor-intensive and worked slowly. Intake lines frequently became clogged; one or more pumps suffered damage.

On May 16, 2001, Airport employees, in order to lower Pond 3W levels, opened the gate connecting Pond 3W to Ponds 3E and 4, and then opened Outfall 4, which discharged to the Frank and Poet Drain. The discharge began about noon on May 16 and continued through the night to the morning of May 17. At approximately 7:30 a.m. on May

Defendant's Initials

17th, Airport employees noted that Pond 3W water had a very strong odor and was turbid, and that Ponds 3E and 4 were turbid and odorous. At that time, Airport employees closed the gate connecting Pond 3W to Ponds 3E and 4. At 1 p.m. on May 17th, employees closed Outfall 4. It is estimated that some 25 million gallons of water were discharged from Ponds 3E, 3W, and 4. The discharge of the turbid, odorous water was not timely reported to the Southeast Michigan District Supervisor of the Surface Water Quality Division, Michigan Department of Environmental Quality (MDEQ) as required by the Permit.

       3.     Agreement.

       A.     Fine. The defendant's attorney has explained the sentencing options available to the defendant. Under Rule 11(c)(1)(c) of the Federal Rules of Criminal Procedure, the parties agree to a sentence of $100,000. The parties recommend that the sentence be composed of the following: $75,000 will be paid as a fine and $25,000 will be paid as community service contributions, as set forth in Paragraph 7 below. These amounts are payable immediately, and will be due no later than 15 days after sentencing.

       B.     Special Assessment. The defendant will pay a special assessment of $125.00 in addition to any fine imposed. Defendant will pay this assessment before sentence is imposed, and defendant will furnish a receipt at sentencing. Defendant will make payment to the United States District Court, Clerk's Office, Theodore Levin U.S. Courthouse, Detroit, Michigan 48226.

       C.     Probation. The parties agree that the defendant will serve a conditional term of probation of four years as set forth below. As a special condition of probation, the Authority will be required to undertake and complete a "Force Main" project, which involves


Defendant's Initials

construction and use of a force main to connect Pond 3W at the Airport to sanitary sewer lines leading to the Detroit Water and Sewerage Department's ("DWSD") treatment plant in Detroit, Michigan. The planning of this project has been underway for a number of months, and its cost currently is estimated at approximately $8.5 million. Prior to the finalization of plans for and implementation of this project, the Authority shall consult with representatives of the Detroit Water and Sewerage Department (DWSD) and the Michigan Department of Environmental Quality (MDEQ) to ensure that when completed, the project can and will be operated in a manner that is consistent with applicable DWSD pretreatment requirements for industrial users, with DWSD's NPDES permit, and with all applicable state and federal Clean Water Act requirements. The project will not be considered complete unless and until DWSD approves the terms and conditions of the operation of the force main. Approval by DWSD may take the form of issuance to the Authority of an appropriately executed contract delineating the terms and conditions of operation or an industrial user's permit.

To ensure completion of the project in the time allotted, the Authority shall submit a report to the Probation Office and to the Southeast Michigan District Office of the Water Division of the MDEQ detailing the progress made every ninety (90) days. The court may, at the request of the defendant, terminate probation in less than four years, provided that the project is complete and operational for not less than 180 days prior to such early termination.

    D.    <u>Agreement by United States</u>. For its part, the United States agrees that it will not prosecute the Authority or the County for other Clean Water Act violations its employees may have committed in May, 2001.

-7-

Defendant's Initials

E.  **Waiver of Rights.** If at any time the Authority attempts to withdraw its guilty plea, attacks the validity of the conviction, or fails to comply with the terms of this agreement, the United States is released from its promise under this agreement and may prosecute the Authority for any Clean Water Act violations arising from conduct committed by Airport personnel during the month of May, 2001, including, without limitation, the conduct set forth in detail above. The Authority waives any double jeopardy defense or any defense arising out of the expiration of the statute of limitations with respect to any such charges.

4.  **Defendant's Waiver of Jury Trial and Appeal Rights.** By entering into this plea agreement and pleading guilty, the Authority waives any and all rights it may have under the Sixth Amendment to have the pertinent facts of its case determined by a jury or by a judge in a speedy public trial. In either case, the finder of fact would be required to find the defendant guilty beyond a reasonable doubt. After the court imposes the sentence described in this agreement, the Authority further waives any right it may have to appeal its conviction or sentence.

5.  **No Other Terms.** This document is the entire agreement between the Authority and the U.S. Department of Justice with respect to the charge noted above in this criminal case. It does not prevent any civil or administrative actions against the Authority by the Department of Justice or any other party. There are no other parties to this agreement.

6.  **Acceptance of Agreement.** This offer automatically expires unless it has been received (fully signed) in the Office of the Environmental Crimes Section by 5:00

-8-

Defendant's Initials

p.m. Friday, May 26, 2006. The U.S. Department of Justice reserves the right to modify or revoke the offer prior to defendant's plea of guilty.

       7.    <u>Community Service</u>. As a special condition of this Agreement, the parties recommend that the defendant make the following community service contribution: Twenty-five thousand dollars ($25,000) to Friends of the Detroit River, a not-for-profit corporation determined to be income tax exempt under section 501(c)(3) of the Internal Revenue Code and dedicated to conserving, restoring and protecting the watershed of the Detroit River, and to be used for those purposes. Because these payments are designated as community service by an organization, the defendant further agrees that it will not seek any reduction in its tax obligations as a result of these community service payments. In addition, since these payments constitute community service as part of the sentence agreed upon in this plea agreement, the defendant will not characterize, publicize, or refer to these community service payments as voluntary donations or contributions.

Dated: _____          _____
                                                    Stephen J. Murphy
                                                    United States Attorney

Dated: _____          _____
                                                      Sue Ellen Wooldridge
                                                    Assistant Attorney General
                                                    Environment & Natural Resources Division
                                                    U.S. Department of Justice


Defendant's Initials

Dated: 6/7/2006

Krishna S. Dighe (P45376)
Assistant Chief Attorney
Environmental Crimes Section
U.S. Department of Justice

Dated: 6/7/06

James A. Morgulec
Senior Counsel
Environmental Crimes Section
U.S. Department of Justice

Dated: _____

Kris Vezner
Special Assistant United States Attorney
Office of Regional Counsel
U.S. Environmental Protection Agency, Reg. 5

By signing this document, the defendant acknowledges that its representative has read this entire document, understands it, and agrees to its terms. The defendant also acknowledges that it is satisfied with its attorney's advice and representation.

Dated: 5-25-06

Lester Robinson, Chief Executive Officer
Wayne County Airport Authority
on behalf of Wayne County Airport Authority

Dated: 5/25/06

James K. Robinson, Esq.
Cadwalader, Wickersham & Taft LLP
Attorney for Defendant

-10-

Defendant's Initials